**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

DEZAI SHONTAI WILLIAMS               :

    Petitioner                                        :

v                                                         :         Civil Action No. JFM-06-1054

JAMES SMITH, *et al.*                         :

    Respondents                                :

o0o

**MEMORANDUM**

Pursuant to the court's order to show cause, respondent filed an answer to the above-captioned petition for writ of habeas corpus. Paper No. 6. Petitioner has filed a reply. *See* Papers No. 13 and 20. Upon review of the papers filed, the court finds a hearing in this matter to be unnecessary. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6. *see also Fisher v. Lee*, 215 F. 3d 438, 455 (4th Cir. 2000) (petitioner is not necessarily entitled to a hearing under 28 U.S.C. § 2254(e)(2)). For the reasons that follow, the petition shall be denied.

**Background**

Petitioner was tried and convicted of the second degree murder of Belton Bell in the Circuit Court for Baltimore City. Mr. Bell was shot and killed in the living room of a house located at 605 Dumbarton Avenue in Baltimore City. Paper No. 6 at Ex. 7. Petitioner pled not guilty to charges of first-degree murder, second-degree murder, second-degree assault and use of a handgun in the commission of a crime of violence and chose to be tried by a jury. *Id*. at Ex. 1.

Prior to trial, petitioner filed a motion to suppress the photographic line-up identification based on his assertion the photographs were unduly suggestive. Petitioner alleged the array was suggestive because the background of his picture was dark while the background of the other

photographs were much lighter.  Paper No. 6 at Ex. 2, pp. 97– 128; Ex. 3, pp. 1– 29; Ex 4, pp. 6 – 20.  The court considered the testimony of the two police officers regarding presentation of the array to Mr. Cornish, the eyewitness who identified petitioner, and preparation of the array.  The officers testified that the pictures obtained for purposes of the array could not be altered in any way and were not selected based on the background color.  Rather, the pictures were selected based on similar physical characteristics shared by the men depicted.  The court also considered the testimony of Mr. Cornish regarding his identification of petitioner as the shooter.  Mr. Cornish testified that: the shooting occurred in a dark room so he could not see the person involved very well; he told the officers he couldn't be certain petitioner was the shooter; and he did not have his reading glasses on at the time. *Id*. Ex. 4 at pp. 6– 18.  Mr. Cornish also testified that the darkness of petitioner's photograph played no role in his identification.  *Id*. at p. 17.  The court ruled the photographic array was not so suggestive as to make it inadmissible and denied the motion to suppress Mr. Cornish's identification.   *Id* at p. 20.

Evidence against petitioner included testimony of three witnesses who were in the house at the time of the shooting.  *Id*. at Ex. 7.  Sheila Henry, Candace Davis and Earl Cornish testified as to what they saw the night Mr. Bell was shot and killed. Their testimony established the following course of events:

> Henry and Davis walked to a store together. They then walked to 605 Dumbarton Avenue where Davis rented a room. When they arrived, Henry saw appellant [Williams], whom she had known for a few months from the neighborhood, in the vestibule. Henry, Davis, and appellant went upstairs to Davis's room together. The victim knocked on the door and said, "Come on, Dezai" to appellant. Appellant and the victim left the room together. Henry then heard appellant and the victim arguing and fighting, and then she heard gunshots. She later saw the victim's body at the bottom of the steps.

2

> Davis also knew appellant for a few months. When she arrived with Henry at 605 Dumbarton, Davis saw appellant's car out front, with the engine running, but no one in it. When Henry and Davis entered the house, Davis saw appellant coming out of the living room and into the foyer. Davis, Henry, and appellant went upstairs to Davis's room. Appellant hit Davis in the face with a gun that looked like a snub-nosed thirty-eight. The victim knocked on the door, and he and appellant left together. Davis heard them go down the steps, and, a few seconds later, she heard two shots.
>
> Earl Cornish was also a resident of 605 Dumbarton Avenue. He stayed in the living room and slept on the couch. On the night of the shooting, the doorbell rang, and Cornish answered it. A black man was at the door and asked for the victim. Behind him were Davis and another woman. Cornish started up the stairs to the attic, and the gentleman and the two ladies went to Davis's room on the second floor. Cornish called to the victim and told him someone was there to see him. When the victim asked who it was, Cornish said, "Your nephew," and the victim came down the stairs, walked down the hall to Davis's room, and called out the name "Dezai." Cornish had never met the man before or heard the name "Dezai" before. Cornish went to the restroom on the second floor. When he came out, he went down the steps and saw the victim and "the other gentleman" standing in the middle of the living room.
>
> Cornish started to walk behind the man and, as he walked in, there was a struggle between the two. Then he "saw the flash of the pistol and heard the report. The bullet came past me and went into the wall." Cornish then ran to an unused bathroom at the rear of the downstairs and laid in the tub. Someone came to the bathroom door, called Cornish's name, knocked on the door, and kicked it in. After about five minutes, Cornish came out and saw the victim lying on the floor by the stairwell. He went to his sister's home and called the police.

Paper No. 6 at Ex. 7, pp. 1– 3. Earl Cornish is the witness who identified petitioner as the man involved in shooting Mr. Bell via photographic line-up presented for his review approximately two hours after the shooting. *Id* at pp. 3– 7; Ex. 4, pp. 51– 56.

At trial, Cornish offered testimony regarding his identification of petitioner as the shooter. During his testimony he was asked to read the written statement he made at the time he chose

3

petitioner's picture which was located on the back of the photo array:

> The person identified seems close to resemblance of shooter. Cannot, however, swear to same due to the fact that the light was not on. But this does seem to be the person.

Paper No. 6 at Ex.4, pp. 53–54.  When Cornish was asked to make an in-court identification of petitioner, he testified as follows:

> Q: And I would ask you to take a look at the defendant, is he the person whose photograph you picked?
>
> A: Seems to be.
>
> Q: Okay. And ask you to look at him and take your time, look at his height, look at his face, look at his complexion, obviously time as passed, so weight, I don't know whether weight is or isn't an issue, but what can you tell us about this man in relation to the person that you saw do the shooting?
>
> A: Nothing.
>
> Q: Nothing.
>
> A: Nothing. Because he had a coat on and he had the collar up and, like I said, he was in the shadows. I can't say anything about this man.
>
> Q: But, what you can say is on the night of the murder, you picked this picture.
>
> A: I would say that this man is closer to anyone else on this picture to the person I saw.
>
> Q: And this is the man whose picture you picked.
>
> A: Yes, it is.

Paper No. 6 at Ex. 4, pp. 55–56.

Although Cornish's identification of petitioner as the shooter was not ironclad, it was not the only evidence used to convict petitioner. In addition to the eyewitness testimony, evidence

4

including DNA profiles of petitioner's blood, the victim's blood, and fingernail clippings taken from the victim at the autopsy was presented. *Id*. at Ex. 7, p. 7.  Through the testimony of Michael Cariola, an employee of a DNA testing company, it was established that petitioner could not be excluded as a genetic contributor to the DNA found under the victim's fingernails and 99% of the African-American community in the United States could be excluded as possible sources of the DNA. *Id*.

## Threshold Considerations

### Exhaustion of State Remedies

Under *Rose v. Lundy*, 455 U.S. 509 (1982), before a petitioner may seek habeas relief in federal court, he must have exhausted each claim presented to the federal court by pursuing remedies available in state court. This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider the claim. *See* 28 U.S.C. § 2254(b) and (c). In Maryland, this may be accomplished by proceeding with certain claims on direct appeal (and thereafter seeking certiorari to the Court of Appeals), and with other claims by way of a post-conviction petition, followed by seeking leave to appeal in the Court of Special Appeals.

Petitioner no longer has any state direct appeal or collateral review remedies available to him with respect to the claims raised in this court; thus, his claims are considered exhausted for the purpose of federal habeas corpus review.

### Statute of Limitations

Respondents do not contend -- and this court does not find -- that the petition is time-barred pursuant to 28 U.S.C. §2244(d).

## Standard of Review

Because the petition was filed after April 24, 1996, it must be evaluated pursuant to amendments to the habeas corpus statutes contained in the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (codified in scattered sections of 28 U.S.C.).[1] Under the AEDPA, federal courts are no longer authorized to correct mere error in state court proceedings, but must instead exercise more limited review. Under the amendments,

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> 1. resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> 2. resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) & (2) (as amended). In reviewing petitioner's attack on his state court conviction, this court presumes that the state court's factual determinations are correct. Petitioner bears the burden of rebutting this presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

In *Williams v. Taylor*, 529 U.S. 362 (2000), Justice O'Connor observed that:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

---

[1] *See Brown v. Angelone*, 150 F.3d 370 (4th Cir. 1998).

*Id*. at 412-13. The Court noted that "the phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision." *Id*. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. With these standards in mind, the court addresses the claim now before it.

## Analysis

Petitioner claims his due process rights were violated by use of an impermissibly suggestive identification procedure. Paper No. 1 at p. 6. He asserts the suppression hearing judge and the trial judge erred when they concluded that the photographic array was not impermissibly suggestive. *Id*. In addition he claims that the eyewitness who was asked to identify the perpetrator using the photographic array admitted that it was impermissibly suggestive and the suppression hearing judge also conceded the point. *Id*. Petitioner claims the array is suggestive because the background of his photograph is dark while the background of the other photographs was white.

This claim was raised on appeal to the Court of Special Appeals. Paper No. 6 at Ex. 7. The court observed that:

> The claim of impermissible suggestiveness with respect to a photographic identification is founded upon principles of due process. *See Moore v. Illinois*, 434 U.S. 220, 227 (1977); *United States v. Wade*, 388 U.S. 218 (1968); *Stovall v. Denno,* 388 U.S. 293 (1967). Due process "protects the accused against the introduction of evidence of, or tainted by, an unreliable pretrial identification obtained through unnecessarily suggestive procedures." *Moore*, 434 U.S. at 227; *see Webster v. State*, 299 Md. 581, 599-600 (1984); *McDuffie v. State*, 115 Md. App. 359, 366 (1997). It also guards against an "'irreparable mistaken identification." *Barrow v. State*, 59 Md. App. 169, 184 (1984), *cert. denied*, 301 Md. 41 (1984) (citation omitted). The due process claim must be evaluated based on the totality of the circumstances. *King v. State*, 18 Md. App. at 266, 268 (1973).

> A due process challenge to an extra-judicial identification requires a two-stage inquiry. *Evans v. State*, 304 Md. 487, 498 (1985), *cert. denied*, 478 U.S. 1010 (1986). The first inquiry is "whether the identification procedure was impermissibly suggestive." *Id.* An identification procedure may be suggestive, where, in effect, the police suggest to the witness, "This is the man." *Foster v. California*, 394 U.S. 440, 443 (1969). If the identification procedure was not unnecessarily suggestive, then the inquiry ends and the extra-judicial identification and in-court identification evidence are admissible. *Webster*, 299 Md. at 620. Only if the procedure is found to be impermissibly suggestive will the suppression court proceed to the second inquiry: "whether, under the totality of the circumstances, the identification was reliable." *Evans*, 304 Md. at 498.
>
> The defense bears the initial burden of showing impermissible suggestiveness. *Brockington v. State*, 85 Md. App. 165, 172 (1990), *cert. denied*, 332 Md. 613 (1991). If a prima facie taint is shown, the State is then required to prove, by clear and convincing evidence, that the "reliability in the identification . . . outweighs the corrupting effect of the suggestive procedure." *Loud v. State*, 63 Md. App. 702, 706, *cert. denied*, 304 Md. 299 (1985); *see McDuffie*, 115 Md. App. at 366-67.
>
> In considering the denial of a motion to suppress, we look only to the record of the suppression hearing. We also consider only that evidence and the inferences from it that are most favorable to the State. *Rowe v. State*, 363 Md. 424, 431 (2001); *Cartnail v. State*, 359 Md. 272, 282 (2000); *In re Tariq A—R—Y*, 347 Md. 484, 488 (1997). We will not disturb the trial court's factual findings unless they are clearly erroneous. *Carter v. State*, 367 Md. 447, 457 (2002).

Paper 6 at Ex. 7, pp. 23– 24.

The appellate court then examined the testimony provided by the eyewitness, Mr. Cornish, at the suppression hearing. *Id*. Through questions presented by defense counsel, Mr. Cornish admitted that the picture of petitioner was "different" but did not find it "odd." He also admitted that the picture stood out to him because it was different but did not think the police were trying to get him to pay closer attention to the picture of petitioner than the other pictures presented. On cross-examination, Mr. Cornish asserted that the fact that one picture was darker than the rest had "no influence whatsoever" over which picture he chose. Mr. Cornish then stated that he chose the picture of petitioner because it looked like the person he saw two hours earlier. Upon questioning

from the bench, Mr. Cornish asserted he did not know petitioner but picked his picture because he looked most like the man involved in the shooting. The court concluded that the photograph having a dark background was not suggestive enough to be impermissible under all circumstances and, therefore, the jury would be permitted to consider the identification "for what it's worth." [2]

Petitioner argued in his appeal that the darkness of the background on his photograph, together with the fact that his complexion appears darker than anyone else depicted, draws the viewer's eye to his picture. The Court of Special Appeals observed Cornish testified that the darkness of petitioner's photograph had no influence on his choice and concluded that the court's decision that the photograph was not "in and of itself suggestive to be impermissible" was not clearly erroneous. The issue of whether the identification was reliable under the totality of the circumstances was not reached by the trial court or the Court of Special Appeals because of the determination that the procedure was not unduly suggestive. *See Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

Petitioner's view that Cornish admitted the photo array was suggestive is belied by the evidence. Cornish never stated that his choice of petitioner's photograph was influenced by the difference in the photograph as compared to the others; in fact, he stated the opposite. The suppression hearing court's decision was not clearly erroneous and the Court of Special Appeals' affirmation is a reasonable application of established law.

## Conclusion

Upon review of the petition for writ of habeas corpus, the response along with the exhibits

---

[2] The undersigned notes, however, that other eyewitness testimony as well as DNA evidence confirmed petitioner as the shooter.

submitted, as well as petitioner's reply, this court determines that petitioner is not entitled to federal habeas relief. There is no basis upon which to find constitutional deficiencies in the state court proceedings, petitioner having failed to rebut the presumption of correctness of the findings of fact underlying the rejection of his grounds for appellate relief. Accordingly, the petition shall be dismissed with prejudice by separate order which follows.


November 14, 2007                                    /s/_____

Date                                                 J. Frederick Motz
                                                     United States District Judge